UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x
Sandra DeAngelis, pro se,

               Plaintiff,

               -against-

Commissioner of Social Security,[1]

               Defendant.
------------------------------------------------------------x

**MEMORANDUM & ORDER**

06-CV-2989 (DLI)

**DORA L. IRIZARRY, U.S. District Judge:**

Plaintiff Sandra DeAngelis filed an application for disability insurance benefits and supplemental security income payments under the Social Security Act (the "Act") on January 14, 2004. Plaintiff's application was denied initially and on reconsideration. Plaintiff acting *pro se* testified at a hearing held before an Administrative Law Judge ("ALJ") on November 2, 2005. By decision dated February 17, 2006, the ALJ concluded that plaintiff was not disabled within the meaning of the Act. On May 2, 2006, the ALJ's decision became the Commissioner's final decision when the Appeals Council denied plaintiff's request for review.

Plaintiff brought the instant action for review of the decision of the Commissioner. Pursuant to Fed. R. Civ. P. 12(c), the Commissioner now moves for judgment on the pleadings, affirming his determination that plaintiff was not disabled because she had the residual functional capacity to perform work at all exertional levels. On May 7, 2007, plaintiff filed a letter opposing the Commissioner's motion. For the reasons set forth below, the Commissioner's decision is affirmed.

---

[1] Pursuant to Fed. R. Civ. P. 25(d), Michael J. Astrue shall be substituted for Commissioner Jo Anne B. Barnhart as the defendant in this action.

1

## I. Summary of Facts

*Plaintiff's Benefits Application and Testimony*

Plaintiff was born on March 6, 1974, and has a general equivalency diploma ("GED") with one year of college. (Admin. R. at 194-95.) Plaintiff currently resides in a first floor apartment in Staten Island, New York, with her husband and two children. (*Id*. at 194.)

From approximately 1992 to 1998, plaintiff worked in the Garment Center in Manhattan processing orders. (*Id*. at 198.) Plaintiff also worked as a bank teller at Staten Island Bank & Trust for one and one-half years between 2000 and 2001. (*Id*. at 69, 196.) Although plaintiff quit her job at Staten Island Bank & Trust on September 11, 2001 because the terrorist attacks "scared her," plaintiff did not seek any psychiatric treatment at that time. (*Id*. at 197, 199.) Following the terrorist attacks, in November 2002, plaintiff and her husband decided relocate to Pennsylvania. (*Id*. at 197.) In Pennsylvania, plaintiff worked as a bank teller at PNC Bank for approximately four months in early 2003, giving out money, cashing checks, making deposits and dealing with customers. (*Id*. at 69, 195-96.) However, plaintiff stopped working at PNC Bank on May 15, 2003 after the bank was robbed while plaintiff was on duty. (*Id*. at 195.) In plaintiff's disability report dated February 8, 2004, plaintiff reported that her disabling conditions, which include anxiety, panic and fear, began immediately following the robbery. (*Id*. at 77.) Plaintiff also commenced psychiatric treatment at Tri-County Human Services Center after the robbery, and began taking Effexor on a daily basis, and Xanax as needed. (*Id*. at 91, 134-47, 199, 205.)

According to plaintiff, during the time she and her husband were living in Pennsylvania, a typical day involved plaintiff's husband dropping her and the children off at plaintiff's sister's house where they would spend the day while plaintiff's husband was at work. (*Id*. at 201.) Plaintiff

"couldn't be at [her] house by [her]self" because she "would just be very nervous and pace around all day and try and sit on the phone . . . [she] would be very, very nervous and that would cause an anxiety attack." (*Id*. at 202.) At the sister's house, plaintiff would spend the day playing with her children, making telephone calls, cooking, going outside with her sister, socializing with people whom she knew, and using the computer. (*Id*. at 201-05.) Plaintiff was able to complete tasks, concentrate on conversations and interact with her sister and children. (*Id*. at 203-04.)

In or about August 2004, plaintiff returned to New York, first living in Brooklyn with her mother-in-law, and then moving back to Staten Island in May or June of 2005. (*Id*. at 200, 206-07.) While living in Brooklyn, a typical day for plaintiff involved walking her older son to school across the street, caring for her younger son, going to Staten Island to visit her family, and "hang[ing] out" at home and shopping with her mother-in-law. (*Id*. at 208.) During this period, plaintiff did not receive any treatment or medication because she did not have any health care insurance. (*Id*. at 207-08.) Plaintiff resumed treatment in July 2005; she testified that her symptoms are better now that she is taking Effexor and Xanax again. (*Id*. at 210-11.)

In a questionnaire completed in March 2004, plaintiff stated that she gets very nervous when she is alone and while showering, she gets bad panic attacks when she shops alone, she does not take public transportation, and she is "always very alert about what goes on around [her], making sure nobody can or will harm [her]." (*Id*. at 86-90, 210, 214.) Plaintiff testified that she has good days and bad days; on a bad day, she is "nervous the whole day," but she feels more safe and secure when she is with other people. (*Id*. at 210-11.) In the questionnaire, however, plaintiff reported no physical limitations: she was able to drive; she played volleyball once a week with her sister; and she could climb "a lot" of stairs, walk a "far" distance, sit for extended periods of time, and lift and

3

carry the "same as usual." (*Id*. at 86-90.) Plaintiff got along "fine" with people in authority, she did not have any difficulty understanding instructions or carrying them out, and she provided "daily regular care as a parent" to her children. (*Id*. at 86.)

When asked by the ALJ why she could not work, plaintiff testified that "[b]eing around people is not [her] problem. [Her] problem is the anxiety and the panic attacks that could trigger something that occurs." (*Id*. at 209.) As explained by plaintiff: "I'm just nervous about if I wake up and I'm having a bad day about getting to the job, about if I leave the job to go and do something for work related, or how I would feel in a situation at work if something would occur, and I would have an anxiety attack. How would I go about it and explain it to a boss you know, or where to take it from there." (*Id*.) Plaintiff further explained that she is afraid to work in a tall building, as well as to work with the public. (*Id*. at 211-12.)

Plaintiff testified that PNC Bank asked her to return to work as a teller in June 2004; however, plaintiff told the bank that she would only consider returning if it was to a different position where she would not have to work directly with the public. (*Id*. at 216.) For instance, plaintiff was willing to work in the back office or Call Center, but PNC Bank "told [her] no." (*Id*.) When asked by the ALJ whether plaintiff had sought similar positions with any other employers, plaintiff responded that she had not because "[she] was afraid that [she] wouldn't be able to do it if anything would occur. . . it was the easy way out because every day is a fight for [her] with the anxiety. And [she] didn't know exactly what . . . would happen if [she] went to work and where." (*Id*. at 217.) However, now that plaintiff is again living in Staten Island, she feels "a little better" and "want[s] to try" to look for work but does not know if she is "going to succeed right now." (*Id*.)

4

*Medical Evidence*

1.   Tri-County Human Services Center

Plaintiff's psychiatric history dates to May 30, 2003, when she began treatment at the Tri-County Human Services Center ("Tri-County") in Pennsylvania. (Admin. R. at 134-35.) Plaintiff complained that she was nervous about going anywhere, could not sleep, was fearful of African-Americans, and suffered panic attacks and nightmares. (*Id*. at 134.) On mental status examination, plaintiff's evaluating therapist, Carol Wilson, reported that plaintiff's mood and affect were anxious and hypervigilant, but plaintiff was oriented three times. (*Id*. at 135.) Ms. Wilson provided a provisional diagnosis of post-traumatic stress disorder ("PTSD"), with a current global assessment of functioning ("GAF") of 35 and past-year GAF of 75.[2] (*Id*.)

In July 2003, plaintiff began treatment with another Tri-County therapist, Barbara Weaver, who focused on fear desensitization using cognitive therapy. (*Id*. at 79.) Plaintiff met with Ms. Weaver on a weekly basis through February 2004. (*Id*.)

Plaintiff was next evaluated by Dr. Eun Suzanna Yoo, a psychiatrist, on December 8, 2003, as to her complaints of nervousness, anxiety and panic attacks. (*Id*. at 97.) Dr. Yoo reported that plaintiff was cooperative and fairly pleasant, and her speech was moderately productive, sensible and coherent; it did not reflect any delusional ideation or other psychotic thought disorders. (*Id*. at 98.) Plaintiff denied having any hallucinations. (*Id*.) Dr. Yoo's clinical impression of plaintiff's

---

[2]A GAF of 35 indicates some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking or mood. A GAF of 75 means that if symptoms are present, they are transient and expectable reactions to psychological stressors; not more than slight impairment in social, occupational, or school functioning. American Psychiatric Association, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 34 (4th ed. 2000).

intelligence was within the normal limit, and plaintiff's memory recollection and abstract thinking ability were clear. (*Id*.) Plaintiff denied symptoms of depression, and stated that although she preferred to work, she didn't "think she [could] handle the job in banking let alone outside." (*Id*. at 98-99.) Dr. Yoo diagnosed plaintiff with panic disorder without agoraphobia and adjustment disorder with anxious mood. (*Id*. at 99.) She also noted a current GAP of 55.[3] (*Id*.) Dr. Yoo prescribed Paxil and Buspar, and recommended continued counseling sessions with Ms. Martin. (*Id*.) Plaintiff met with Dr. Yoo again on January 7, February 4, April 7, May 18, June 15, August 10 and November 2, 2004, complaining of continued panic attacks. (*Id*. at 136-42.) On January 7, 2004, Dr. Yoo discontinued plaintiff's Paxil prescription because it made her anxious and hyper, and, instead, prescribed Effexor and Xanax. (*Id*. at 142.) After evaluating plaintiff during her subsequent visits, Dr. Yoo reported that plaintiff's response to treatment had been favorable and her diagnosis was unchanged. (*Id*. at 136-42.)

2. State Agency Reviewer

On March 26, 2004, a State Agency employer reviewed plaintiff's file and completed a psychiatric review technique and mental residual functional capacity evaluation. (*Id*. at 110-117.) The reviewer opined that plaintiff had mild limitations in daily living activities, and moderate limitations in maintaining social functioning and maintaining concentration, persistence and pace. (*Id*. at 110.) He further opined that plaintiff was moderately limited in her ability to carry out detailed instructions, maintain attention and concentration for extended periods of time, and complete a normal workday and workweek without interruptions from psychologically based

---

[3]A GAF of 55 represents moderate symptoms or moderate difficulty in social, occupational or school functioning. *Id*. at 34.

symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (*Id*. at 114-15.) The reviewer found no other limitations. (*Id*.)

3. <u>Staten Island University Hospital</u>

On August 25, 2005, plaintiff presented at the Staten Island University Hospital complaining of "very bad panic attacks," which she described as getting hot, lightheaded, and feeling like she might pass out. (*Id*. at 154.) Plaintiff told the evaluating clinical social worker, Margo Harris, that although she had been coping with these symptoms "on some level for a long time," they were exacerbated by the bank robbery. (*Id*. at 157.) Plaintiff reported that she wanted to go back to work, but was not actively seeking employment at that time. (*Id*. at 155.) Ms. Harris's initial diagnostic impression was PTSD and panic disorder with agoraphobia. (*Id*. at 157.)

Plaintiff underwent a psychiatric evaluation on September 6, 2005 by Dr. Roberto Paranal for complaints of anxiety and nervousness. (*Id*. at 159-61.) Plaintiff reported that she was always a nervous person, but that she was able to control her anxiety until the bank robbery on May 15, 2003. (*Id*. at 159.) Since that time, plaintiff had experienced worsening anxiety, avoidant behavior and panic attacks. (*Id*.) During a panic attack, plaintiff experienced palpitation, shortness of breath, trembling, sweating, and feeling a loss of control. (*Id*.) Plaintiff denied any depression or psychotic symptoms, and she had no history of psychiatric hospitalizations. (*Id*.) She told Dr. Paranal that the Effexor medication prescribed by Dr. Yoo had been partially helpful because it lessened her symptoms. (*Id*.)

Dr. Paranal described plaintiff as appropriately groomed and dressed, cooperative, and with good eye contact. (*Id*. at 160.) Her mood was mildly depressed and anxious, but her affect was appropriate. Her speech was spontaneous, coherent and goal directed, and there was no evidence

7

of thought disorder or delusions; plaintiff denied auditory or visual hallucinations, and suicidal or homicidal ideations. Plaintiff was alert, and oriented three times. Her short and long term memory was good, and her judgment and insight were not impaired. Dr. Paranal diagnosed chronic PTSD, panic disorder with agoraphobia, generalized anxiety disorder, and avoidance traits. (*Id*.) Dr. Paranal gave plaintiff a prescription for Effexor. (*Id*.) Following plaintiff's next visit with Dr. Paranal, on October 4, 2005, Dr. Paranal reported that plaintiff showed "some improvement" with her anxiety, but remained fearful when alone. He increased her Effexor dosage. (*Id*. at 171.)

On October 21, 2005, plaintiff was seen for individual counseling by Ms. Harris. (*Id*. at 168.) Plaintiff stated that the increased dosage of Effexor was helping her anxiety somewhat, but that plaintiff's husband's verbal and emotional abusiveness contributed to her unhappiness. Plaintiff stated that she needed to work on her marriage to improve her functioning, and the majority of the session was spent discussing their relationship. (*Id*.)

Plaintiff met with Dr. Paranal again on November 3, 2005, and reported that her anxiety symptoms and panic attacks were "much improve[d]." (*Id*. at 171.) Similarly, on November 4, 2005, plaintiff told Ms. Harris that she was "feeling better," was "somewhat less anxious," and that her medication "may be helping." (*Id*. at 169.) Ms. Harris gave plaintiff information about VESID (vocational and educational services for individuals with disabilities), and counseled her to avoid face-to-face interaction with the public, elevators, high floors, bad neighborhoods and public transportation; plaintiff should be behind the scenes but not isolated. (*Id*.) On November 30, 2005, plaintiff reported to Dr. Paranal that she was doing well. (*Id*. at 172.)

4.   <u>Consultative Psychiatric Examiner</u>

On September 28, 2005, plaintiff was examined by Dr. Rajam Theventhiran, a consultative

8

psychiatrist. (*Id*. at 130-33.) Plaintiff complained of anxiety and panic symptoms, which worsened after the bank robbery; however, plaintiff again denied any psychotic or manic symptoms. (*Id*. at 131-32.) On mental health examination, plaintiff appeared casually and neatly dressed, she was cooperative, and her speech was normal in tone and volume. (*Id*. at 132.) She provided coherent answers, and her thought process was organized and goal oriented with no delusions. Plaintiff stated that her mood was anxious, but Dr. Theventhiran reported that she appeared neutral with appropriate affect. Dr. Theventhiran assessed plaintiff's intellectual functioning as average, and her insight and judgment as fair. Her understanding, memory, calculation and concentration were within normal limits. Although plaintiff exhibited some anxiety symptoms, she had only recently resumed treatment. (*Id*. at 133.) Dr. Theventhiran opined that, with continued treatment, plaintiff's mental status and functioning levels would improve, and she would be able to interact appropriately with her peers and carry out orders from her supervisors. (*Id*.) Dr. Theventhiran diagnosed plaintiff with anxiety disorder (not otherwise specified), and ruled out panic disorder without agoraphobia. (*Id*.)

*The ALJ's Decision*[4]

In a written decision dated February 17, 2006, the ALJ concluded that plaintiff was not disabled within the meaning of the Social Security Act and, therefore, was not entitled to either disability insurance benefits or supplemental security income payments. The ALJ utilized the five-step sequential analysis set forth in 20 C.F.R. § 404.1520 to reach her conclusion. The ALJ resolved step one in plaintiff's favor because she had not performed substantial gainful activity during the relevant period. At step two, the ALJ found that plaintiff suffered from one or more "severe"

---

[4] The court notes that plaintiff knowingly waived the right to representation, and chose to proceed with the hearing *pro se*. (*See* Admin. R. at 185-87.)

9

impairments, as defined by the Act. However, the ALJ resolved step three against plaintiff, finding that plaintiff's impairments, either alone or in combination, were not sufficiently "severe" to meet or equal an impairment listed in Appendix 1.

The ALJ next analyzed plaintiff's "residual functional capacity." Under step four, the ALJ concluded that plaintiff was unable to perform past relevant work as a bank teller. However, the ALJ found that plaintiff retained the residual functional capacity to perform work at all exertional levels, so long as plaintiff avoids jobs requiring more than occasional face to face interaction with the general public. The ALJ also found that plaintiff had occasional limitations in concentration and pace. The ALJ noted that the burden then shifted to the Social Security Administration to show that plaintiff could perform other work consistent with her age, education and work experience. At step five, the ALJ found that plaintiff, as a younger individual with a general equivalency diploma ("GED") and no transferable work skills, could perform work at all exertional levels. Using Medical-Vocational Rule 204.00 as a framework for decision-making, the ALJ concluded that the claimant was "not disabled," signifying that there were a significant number of jobs existing in the economy that an individual such as plaintiff could perform.

## II.     Discussion

### A.     Standard of Court Review

In reviewing the final decision of the Commissioner, a district court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision. *See Schaal v. Apfel*, 134 F.3d 496 (2d Cir. 1998). The former determination requires the court to ask whether "the claimant has had a full hearing under the [Commissioner's] regulations and in accordance with the beneficent purposes of the Act." *Echevarria v. Sec'y of Health and Human*

*Servs.,* 685 F.2d 751, 755 (2d Cir. 1982) (citation and internal quotation marks omitted). The latter determination requires the court to ask whether the decision is supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)).

The district court is empowered "to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the case for a rehearing." 42 U.S.C. § 405(g). A remand by the court for further proceedings is appropriate where "the Commissioner has failed to provide a full and fair hearing, to make explicit findings, or to have correctly applied the regulations." *Manago v. Barnhart*, 321 F. Supp. 2d 559, 568 (E.D.N.Y. 2004) (collecting Second Circuit cases). A remand to the Commissioner is also appropriate "where there are gaps in the administrative record." *Rosa v. Callahan*, 168 F.3d 72, 83 (2d Cir. 1999) (quoting *Sobolewski v. Apfel*, 985 F. Supp. 300, 314 (E.D.N.Y. 1997)).

### B. Standards Governing Evaluation of Disability Claims by ALJ

An individual is "disabled" under the Act where there is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). The claimant bears the initial burden of proof of showing disability by presenting "medical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques," as well as any other evidence the Commissioner may require. 42 U.S.C. § 423(d)(5); *see also See Carroll v. Sec'y of Health and Human Servs.,* 705 F.2d 638, 642 (2d Cir. 1983).

Pursuant to 20 C.F.R. §§ 404.1520 and 416.920, there is a five-step process by which the ALJ determines disability under the Act. If at any step the ALJ finds that the claimant is either disabled or not, the inquiry ends. At the first step, the claimant is not disabled if he or she is working and performing "substantial gainful activity." 20 C.F.R. §§ 404.1520(b); 416.920(b). Second, the ALJ considers whether the claimant has a "severe impairment," without reference to age, education, or work experience. Impairments are "severe" when they significantly limit a claimant's physical or mental "ability to conduct basic work activities." 20 C.F.R. §§ 404.1520(c); 416.920(c).

At the third step, the ALJ will find the claimant disabled if his or her impairment meets or equals an impairment listed in Appendix 1.[5] 20 C.F.R. §§ 404.1520(d); 416.920(d). If the claimant does not have a listed impairment, the ALJ makes a finding about the claimant's "residual functional capacity" in steps four and five. 20 C.F.R. §§ 404.1520(e); 416.920(e). In the fourth step, the claimant is not disabled if he or she is able to perform "past relevant work." 20 C.F.R. §§ 404.1520(e); 416.920(f). Finally, in the fifth step, the ALJ determines whether the claimant could adjust to other work existing in the national economy, considering factors such as age, education, and work experience; if so, the claimant is not disabled. 20 C.F.R. §§ 404.1520(f); 416.920(g). The burden of showing that the claimant could perform other work in this final step shifts to the Commissioner. *See Draegert v. Barnhart*, 311 F.3d 468, 472 (2d Cir. 2002) (citing *Carroll*, 705 F.2d at 642).

**C.  Substantial Evidence Supports the ALJ's Determination that Plaintiff is Not Disabled**

While the court sympathizes with plaintiff's mental impairments, it is clear that the ALJ's determination is supported by substantial evidence. First, plaintiff's responses to the questionnaire

---

[5] 20 C.F.R. pt. 404, subpt. P, app. 1.

12

completed in March 2004 attest to her lack of physical limitations. Plaintiff reported that she was able to drive, climb "a lot" of stairs, walk a "far" distance, sit for extended periods of time, and lift and carry the "same as usual." (Admin. R. at 86-90.) Plaintiff further reported that she played volleyball with her sister once a week. (*Id*. at 88.)

Second, substantial evidence supports the ALJ's finding that plaintiff's mental impairments do not significantly compromise her capacity to perform work at all exertional levels. (*Id*. at 18.) Plaintiff's testimony at the hearing demonstrates that she was not significantly limited in her ability to perform activities of daily living. While living in Pennsylvania, plaintiff testified that she spent most days at her sister's house playing with her children, making telephone calls, cooking, going outside with her sister, socializing with people whom she knew, and using the computer. (*Id*. at 201-05.) She further testified that she was able to complete tasks, concentrate on conversations, and interact with her sister and children. (*Id*. at 203-04.) After plaintiff returned to Brooklyn, plaintiff testified that she walked her older son to school across the street, cared for her younger child, traveled to Staten Island to visit her family, and "h[u]ng out" at home and shopped with her mother-in-law. (*Id*. at 208.) Moreover, in the questionnaire dated March 2004, plaintiff stated that she got along "fine" with people in authority, she did not have difficulty understanding instructions or carrying them out, and she provided "daily regular care as a parent" to her children. (*Id*. at 86.)

Furthermore, plaintiff's own statements, both at the hearing and to her treating physicians, demonstrate that she is able to work. Plaintiff testified that PNC Bank asked her to return to work as a teller in June 2004, notably one year after the robbery. Although plaintiff was admittedly willing to work in a different position where she would not have to interact directly with the public, such as in the back office or Call Center, PNC Bank was not able to grant plaintiff's requested

13

accommodation. (*Id*. at 216.) In addition, Dr. Yoo's progress note dated May 18, 2004 reports that plaintiff wanted to move back to New York and get "a job she likes to do," and Ms. Harris's integrated admission assessment dated August 25, 2005 reports that although plaintiff was not actively seeking employment, she wanted to go back to work. (*Id*. at 139, 155.) At the hearing, plaintiff also conceded that she had been feeling "a little better" since moving back to Staten Island in May or June of 2005, and "want[ed] to try" to look for work, although she was skeptical about whether she would "succeed right now." (*Id*. at 217.)

Although the ALJ found plaintiff's subjective complaints of symptoms and limitations to be exaggerated, the ALJ, and not the court, has the discretion to do so, so long as the ALJ considers all the evidence regarding the extent of plaintiff's complaints. *See Aponte v. Sec'y, Dept. of Health and Human Servs.,* 728 F.2d 588, 591 (2d Cir. 1984) ("If the [Commissioner's] findings are supported by substantial evidence, the court must uphold the ALJ's decision to discount a claimant's subjective complaints of pain."); *see also* SSR 96-7p, 1996 WL 374186 (S.S.A. July 2, 2006) (stating that the ALJ must consider the "entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record."). Here, as in *Aponte*, the medical evidence does not support plaintiff's concerns about returning to work.

Dr. Yoo, plaintiff's treating psychiatrist from December 2003 to November 2004, consistently reported that plaintiff's mental status, sleep and appetite were normal, plaintiff's intelligence was within normal limits, and her memory recollection and abstract thinking were clear, with only occasional limitations in her judgment and insight. (*Id*. at 136-42.) Plaintiff repeatedly

denied any symptoms of depression or hallucinations. (*Id.*) Although plaintiff complained of continued panic attacks during each visit, Dr. Yoo's progress notes uniformly state that plaintiff's response to treatment had been favorable. (*Id.*)

Similarly, Dr. Paranal reported that plaintiff was cooperative and maintained good eye contact, her speech was spontaneous, coherent and goal directed, and there was no evidence of thought disorder or delusions. (*Id.* at 160.) Plaintiff was alert and oriented three times, her short and long term memory was good, and her judgment and insight were not impaired. (*Id.*) Although plaintiff's mood was mildly depressed, her affect was appropriate and she again denied any depression or psychotic symptoms. (*Id.* at 159-60.) Plaintiff also reported to Dr. Paranal during her initial evaluation that the Effexor medication prescribed by Dr. Yoo had been partially helpful in lessening her symptoms, and, during a follow-up visit on November 3, 2005, plaintiff reported that her anxiety symptoms and panic attacks were "much improve[d]," presumably due to the increased dosage of Effexor. (*Id.* at 159, 171.) On November 4, 2005, plaintiff similarly told Ms. Harris that she was "feeling better," was "somewhat less anxious," and that her medication "may be helping," and on November 30, 2005, plaintiff told Dr. Paranal that she was doing well. (*Id.* at 169, 172.)

During plaintiff's consultative examination with Dr. Theventhiran on September 28, 2005, plaintiff again appeared casually and neatly dressed, spoke in a normal tone and volume, and provided coherent answers, indicating that her thought process was organized and goal oriented with no delusions. (*Id.* at 132.) Although plaintiff reported that her mood was anxious, Dr. Theventhiran noted that she appeared neutral with appropriate affect, and had only recently resumed treatment. (*Id.* at 132-33.) Dr. Theventhiran assessed plaintiff's intellectual functioning as average, her insight and judgment as fair, and her understanding, memory, calculation and concentration as within

normal limits. (*Id*.) With continued treatment, Dr. Theventhiran opined that plaintiff's mental status and functioning levels would improve, and she would be able to interact appropriately with her peers and carry out orders from her supervisors. (*Id*. at 133.)

Significantly, neither Dr. Yoo, Dr. Paranal, Dr. Theventhiran nor Ms. Harris ever reported that plaintiff was either unable to work or had any particular limitations in her mental functioning or daily living activities. In any event, the ALJ duly accounted for plaintiff's subjective concern about interacting with the public and Ms. Harris's advice to plaintiff to about avoiding face-to-face interaction with the public; the ALJ found that although plaintiff had the residual functional capacity to perform work at all exertional levels, plaintiff must avoid jobs requiring more than occasional face to face interaction with the general public. (*Id*. at 17-18.) The ALJ also took into account the state agency reviewer's findings regarding plaintiff's nonexertional limitations. Specifically, with respect to plaintiff's residual functional capacity, the ALJ found that plaintiff had occasional limitations in concentration and pace. (*Id*.)

Accordingly, the ALJ's application of Medical-Vocational Rule 204.00 and determination that plaintiff was not disabled are supported by substantial evidence.

## III. Conclusion

For the reasons set forth above, the decision of the Commissioner is affirmed. Defendant's motion for judgment on the pleadings pursuant to Fed. R. Civ. P 12(c) is therefore granted. Plaintiff's motion is denied and the case is dismissed.

SO ORDERED.

DATED: Brooklyn, New York
August 29, 2007

_____/s/_____
DORA L. IRIZARRY
United States District Judge